IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO


| | | |
|---|---|---|
| TERRY LYNN BEADLE, | ) | CASE NO. 3:16CV313 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JEFFREY J. HELMICK |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |


Plaintiff Terry Lynn Beadle ("Beadle") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

As set forth more fully below, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

## I. Procedural History

Beadle protectively filed applications for DIB and SSI on July 5, 2013, alleging a disability onset date of June 6, 2013. Tr. 177, 183, 199. She alleged disability based on the following: "vision problems due to diabetes." Tr. 206. After denials by the state agency initially (Tr. 63, 64) and on reconsideration (Tr. 83, 84), Beadle requested an administrative hearing. Tr. 7. A hearing was held before Administrative Law Judge ("ALJ") Yvette Diamond on February

1

6, 2015. Tr. 9-49. In her February 23, 2015, decision (Tr. 88-96), the ALJ determined that

Beadle could perform her past relevant work, i.e., she was not disabled. Tr. 95. Beadle

requested review of the ALJ's decision by the Appeals Council (Tr. 6) and, on December 10,

2015, the Appeals Council denied review, making the ALJ's decision the final decision of the

Commissioner. Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Beadle was born in 1961 and was 51 years old on the date her applications were filed.

Tr. 199. She graduated from high school and attended vocational school. Tr. 16. At the time of

the hearing, she was working part-time as a cashier at a gas station. Tr. 16-17. She previously

worked at a kitchen in a nursing home; as a cashier, assistant manager and store manager at a

Family Dollar store; a cafeteria manager; a deli clerk; an ice cream store manager; and a shirt

presser at a dry cleaner. Tr. 18-23.

### B. Relevant Medical Evidence[1]

---

[1] Beadle, who is represented by counsel, does not provide any summary of the medical records or any citations to the record in the fact section of her brief on the merits, contrary to the following Court Order in this case:

> **PLEASE NOTE**: Plaintiff's brief shall first set forth a list of "Legal Issues," followed by a recitation of "Facts," and then an "Argument" or "Analysis" section. **In the "Facts" section, the brief shall cite, by exact and specific transcript page number, the pages relating these facts**. For example, a citation to a medical finding contained on a single page of a 20 page Exhibit must cite to the specific page, not generally to the 20 pages of the Exhibit. **All facts relevant to the legal issues and discussion must be set forth in the "Facts" section**. Defendant's brief shall specifically address the legal issues and facts cited by plaintiff and **shall cite, by exact and specific transcript page number, all relevant facts in a "Facts" section. The "Facts" section of both briefs shall accurately recite the record without argument, coloring, or "spin." The arguments should be in the "Argument" or "Analysis" section of the brief, not in the "Facts" section.**
>
> **The parties are expected to fully and fairly present to the Court all relevant evidence in the record, both favorable and unfavorable**. For example, on issues involving an evaluation of the weight of the evidence, a party should not cite only to the evidence either rejected or relied upon by the ALJ. **A full recitation of all relevant evidence should be presented**. Briefs shall cite concisely the relevant statutory and case law supportive of the party's position. **Any facts recited in support of the "Argument" or "Analysis" section of the brief must also be set forth in the "Facts" section of the brief.**
>
> **Any factual allegations or arguments relying upon the record that either do not cite to**

On January 12, 2012, Beadle saw Willis Morse, M.D., as a new patient to be treated for hypertension.  Tr. 301-302.  Dr. Morse noted that Beadle was a diabetic.  Tr. 301.  She was asymptomatic at the time and had a normal examination.  Tr. 301, 302.  She returned for a routine follow-up on September 24, 2012.  Tr. 296-298.  She had not been checking her blood pressure at home, but her blood pressure control was good.  Tr. 296.  She was again asymptomatic and had a normal physical exam.  Tr. 296, 298.

On May 15, 2013, Beadle went to the emergency room complaining of high blood sugar.  Tr. 267.  Her sugar levels had been 383.  Tr. 270.  She explained that her sugar levels were spiking despite her medications but that she did not notify her family doctor "because of cost."  Tr. 270.  The hospital note stated, "Patient in need for diabetic education for diet."  Tr. 270.

On June 4, 2013, Beadle returned to the emergency room complaining that her blood sugar levels had been running high for the last month and that she had been having intermittent blurry vision.  Tr. 276.  She had not been taking her diabetic medication, glipizide, as prescribed, "because of financial issues."  Tr. 276.  Her blood sugar level was 445.  Tr. 276.  She was treated, her blood sugar level came down, she felt better, and she was discharged.  Tr. 276.  The hospital note reads, "We determined that she is able to get the glipizide on the $4 list at several different pharmacies, and she was given this information as well as a prescription for glipizide."  Tr. 276-277.

On June 6, 2013, Beadle followed up with Dr. Morse for her hypertension.  Tr. 293.  She had been doing well with blood pressure control and she was currently asymptomatic.  Tr. 293.  She stated that she smoked, did not have a healthy diet, and she did not exercise.  Tr. 293.  Upon

---

the record or are unsupported by the record citation will not be considered by the Court.

Doc. 6, pp. 2-3 (emphasis in original).  Beadle cites to only three medical records in her entire brief, all in the argument section.  *See* Doc. 12, p. 4-6.  Accordingly, the Court summarizes herein the medical evidence provided by Defendant in the facts section of her brief.

exam, she was in no acute distress, exhibited a normal gait, normal motor strength, and normal sensation in her extremities. Tr. 294-295. Dr. Morse noted that she had poor diabetic control and referred her to endocrinology. Tr. 295. He advised that Beadle could not drive until she got her diabetes under control because it was affecting her vision. Tr. 286.

On August 29, 2013, Beadle met with optometrist Eric Hohenberger, O.D., for a vision examination. Tr. 323-324. She reported blurry vision and seeing night halos and explained that her blood sugar had been very high but that it was currently under control. Tr. 323. Dr. Hohenberger evaluated Beadle and diagnosed her with nearsightedness (myopia) and farsightedness (presbyopia); she did not have diabetic retinopathy. Tr. 324.

Between September 14, 2013, and September 19, 2013, Beadle was hospitalized for elevated blood sugar levels. Tr. 337. She had run out of her insulin over a month prior to her visit and had weakness and dizziness. Tr. 347, 437. Her blood sugar level was in the 600s. Tr. 347. She was treated with an insulin drip, her blood sugars dropped down between 170 and 300, she felt much better, and she was discharged. Tr. 337. She was diagnosed with uncontrolled diabetes secondary to noncompliance due to economic reasons. Tr. 337.

On September 19, 2013, Beadle saw Dr. Morse for a follow-up from her hospital visit. Tr. 329. Upon exam, she was in no acute distress and had a normal gait, normal motor strength and normal sensation in her extremities. Tr. 331. Dr. Morse encouraged her to quit smoking and to follow the diabetic diet instructions she was given from the hospital. Tr. 332. Beadle stated that she had applied for social security disability because she did not have medical insurance. Tr. 332. Dr. Morse filled out a medical questionnaire (discussed below). Tr. 429.

On December 18, 2013, Beadle returned to Dr. Morse for a routine checkup. Tr. 389. She was asymptomatic and, upon examination, had a normal gait, normal motor strength, normal

reflexes, and normal sensation in her extremities.  Tr. 389, 391.  Dr. Morse noted that Beadle was "[g]enerally doing well" and that her blood sugars were better controlled with adherence to medication.  Tr. 392.  On January 27, 2014, Beadle saw Dr. Morse complaining that she stubbed her toe.  Tr. 381, 385.

On January 29, 2014, Beadle saw endocrinologist Aparna Brown, M.D.  Tr. 407.  In her detail of Beadle's medical history, Dr. Aparna indicated that Beadle had sensory neuropathy mostly in her feet and occasionally in her hands.  Tr. 408.  Upon exam, Beadle had no neuropathy in her feet and her vibratory sensations were intact.  Tr. 410.

On April 30, 2014, Beadle told Dr. Brown that she felt well and had no new complaints. Tr. 402.  Her history included mild peripheral neuropathy.  Tr. 402.  Upon exam, Dr. Brown detected no neuropathy in her feet and her vibratory sensations were intact.  Tr. 402.

On August 5, 2014, Beadle saw nurse practitioner Paul Gallagher at Dr. Brown's office. Tr. 398-399.  She stated that she felt well with no new complaints other than fatigue.  Tr. 398. Upon exam, she had diminished vibratory sensation in her right foot but normal motor strength. Tr. 398-399.

On November 5, 2014, Beadle saw Dr. Brown again for a routine follow-up appointment. Tr. 393.  She felt well with no new complaints other than fatigue from working.  Tr. 393.  Upon exam, she had diminished right foot sensation but normal motor strength.  Tr. 393, 395.

### C.  Medical Opinion Evidence

#### 1.  Treating Source Opinion

On June 6, 2013, Dr. Morse filled out a prescription stating that Beadle had uncontrolled diabetes that affected her vision, that she is currently undergoing treatment to improve her vision, and that she could not currently drive until she had better diabetes control.  Tr. 286.

On September 19, 2013, Dr. Morse completed a medical questionnaire.  He opined that Beadle could stand/walk one hour at a time for a total of three hours in an eight-hour workday; she could sit for one hour at a time for a total of three hours in an eight-hour workday; she could lift or carry up to five pounds; and her ability to push/pull, bend, reach, handle, and engage in repetitive foot movement was markedly limited.  Tr. 429.  Her ability to see was not significantly limited.  Tr. 429.

### D.  Testimonial Evidence

#### 1.  Beadle's Testimony

Beadle was represented by counsel and testified at the administrative hearing.  Tr. 14-38. She lives in a house with her mother, her brother, his wife and their two children.  Tr. 14-15. Before moving in with her mother approximately seven months ago, she lived alone.  Tr. 24. She has three adult children and six grandchildren.  Tr. 14.  She drove herself to the hearing and it was a 15-20 minute drive.  Tr. 15.  The ALJ referenced her doctor's note that she should not drive and asked why she was driving; Beadle responded that she had no other way to get to the hearing and that she continued to drive.  Tr. 15.

Beadle currently worked as a cashier at a gas station and had been doing so for about six months.  Tr. 16-17.  She worked 20 hours a week, generally in 3-4 hour shifts.  Tr. 17.  At work, she sat for approximately one hour and stood and walked for approximately three hours.  Tr. 17. The heaviest item she lifts is a pricing gun.  Tr. 17.  Before this job she worked as a cashier at another gas station.  Tr. 18.  She left that job because she worked only 13 hours a week and she wanted more hours.  Tr. 18.  Prior to that first gas station job, around the time of her alleged onset, she did not work.  Tr. 19.  When asked if she received Medicaid, she stated, "I'm on a Paramount card; I'm not sure if that's Medicaid or not."  Tr. 19.

Beadle described her jobs and duties that she performed prior to her alleged onset date. Tr. 19.  At a Family Dollar Store she loaded and unloaded trucks, stocked shelves, checked orders, cashiered, and scheduled and supervised other employees.  Tr. 20.  She lifted up to 50 pounds.  Tr. 20.  When she worked as a cafeteria manager she prepped vegetables for salads.  Tr. 21.  She performed this job standing and lifted 20 pound boxes of lettuce.  Tr. 21.  She worked as a deli clerk for four months; she stopped working there because they closed the store.  Tr. 22.  As a shirt presser she put shirts on a machine.  Tr. 23.

She stopped working full time and switched to part time work because "I ended up in the hospital because my diabetes was way out of control and I couldn't work while I was there.  And then when I got out, I tried to get a job but it's like, nobody's hiring to get full-time, so I just went with what I could get."  Tr. 24.  She had applied online for management or assistant management jobs.  Tr. 24.  If her current employer offered her more hours it would be "awful hard" for her to take them because she gets tired all the time and her body is aching and sore.  Tr. 24.  Her legs are sore and her feet hurt.  Tr. 37.  When asked if she could work more hours, she stated that she "probably could" if she pushed herself, but that "it would tear me up" and, in any event, she couldn't do it on a regular basis.  Tr. 37.

Beadle testified that Dr. Morse is her family doctor and that she has been seeing him for five years.  Tr. 25.  She has not seen him for over a year, however, because she began seeing an endocrinologist, Dr. Brown, instead.  Tr. 25.  Dr. Morse used to prescribe her diabetes medication but now she gets that medication from Dr. Brown.  Tr. 25-27.  She sees Dr. Brown every three months.  Tr. 27.  She takes her medications regularly and they are helpful.  Tr. 28. When asked to explain portions of the record indicating that she did not take her medications regularly, Beadle stated that, when she is working, "I can't just stand at the counter and give

myself a shot [of insulin], so I wait until I get home to take it." Tr. 28-29.  She stopped working at the nursing home after three days because she was unable to take the time to eat and take her medications.  Tr. 36.  She also explained that, when she was not working, she did not have insurance or money to pay for her medication.  Tr. 29.  She indicated that she was able to get her medication now because she has insurance.  Tr. 29.  She also stated that she smoked cigarettes: currently she smokes about four cigarettes a day, but, at the time of her alleged onset in June 2013, she was smoking a pack a day.  Tr. 29-30.

Beadle stated that she does not provide assistance to her mother, such as taking her to doctor appointments, explaining, "She does things pretty much on her own."  Tr. 31.  She does not baby sit her brother's children or her grandchildren.  Tr. 31.  Four of her grandchildren live out of town.  Tr. 31.  The last time she saw them was at Easter and they made Easter baskets.  Tr. 32.  Around the house she does laundry, cleans, washes dishes, vacuums, sweeps, shops for groceries, and fixes meals.  Tr. 32-33.  She does not do yard work.  Tr. 33.  She does not do any exercise other than when she has to walk down an aisle at work to find something for a customer. Tr. 33.  On a typical day, she gets up around 7:00 and feeds the dog and lets him out.  Tr. 35. Then she showers, gets dressed, and goes to work on days she is working.  Tr. 35.  When she comes home from work she gets things ready for her dinner.  Tr. 35-36.  She estimated that she is able to lift 10 pounds; "I have a heck of a time picking up a big old bag of potatoes at the store, but I do it."  Tr. 36.  She could lift 10 pounds "maybe once, twice at the most" per hour.  Tr. 37.

### 2. Vocational Expert's Testimony

Vocational Expert David Couch ("VE") testified at the hearing.  Tr. 38-49.  The ALJ discussed with the VE Beadle's past relevant work as a retail assistant manager, food service manager, delicatessen counter worker, shirt presser, salad maker, convenience store clerk, and

8

retail manager.  Tr. 41-43.  The ALJ asked the VE to determine whether a hypothetical individual of Beadle's age, education and work experience could perform those jobs if the individual had the following characteristics: can lift and carry 20 pounds occasionally and 10 pounds frequently; can stand or walk for six hours out of an eight hour workday and sit for six hours out of an eight hour workday; can frequently push or pull, climb, balance, stoop, kneel, crouch and crawl; and can occasionally climb ladders.  Tr. 43.  The VE answered that such an individual could perform the jobs of convenience store clerk, food service manager, shirt presser and salad maker; retail manager and retail assistant manager as described in the DOT but not as performed previously by Beadle, and delicatessen counter worker as described by Beadle but not as described in the DOT.  Tr. 44.

The ALJ asked if such an individual could perform Beadle's past work if that person had the following additional limitations: can occasionally push or pull, climb, balance, stoop, kneel, crouch and crawl, and must be able to switch between standing and sitting throughout the day. Tr. 45.  The VE answered that such an individual could perform the job of convenience store clerk.  Tr. 46.  The ALJ asked if such an individual could perform Beadle's past work if the individual was further limited to standing or walking and sitting for four hours out of an eight-hour workday but would no longer require a sit-stand option.  Tr. 46.  The VE answered that such an individual could not perform any of Beadle's past work.  Tr. 46.  The ALJ asked what the customary tolerances for excused or unscheduled absences are and the VE stated that, in his opinion, two or more absences a month would preclude work.  Tr. 46.  The ALJ asked what the customary number and length of breaks permitted during a workday are and the VE stated that custom and labor laws provide for a 15-minute break every two hours of work in addition to a 30-minute lunch break.  Tr. 46.  The ALJ asked how much off-task time is permitted in addition

9

to these regular breaks and the VE replied that, in his opinion, an individual could be off task up to 19% of the time and still retain work in most positions.  Tr. 47.

Beadle's attorney asked the VE whether Beadle could perform her past jobs if she were limited to sedentary work.  Tr. 48.  The VE answered that she could not.  Tr. 48.  Beadle's attorney asked if there were any transferrable skills from Beadle's past jobs to the sedentary level and the VE answered that there were not.  Tr. 48.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a

listed impairment, claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy. *Id.*

## IV. The ALJ's Decision

In her February 23, 2015, decision, the ALJ made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2007. Tr. 90.

2.      The claimant has not engaged in substantial gainful activity since June 6, 2013, the alleged onset date. Tr. 90.

3.      The claimant has the following severe impairments: diabetes mellitus, polyneuropathy, chronic obstructive pulmonary disease (COPD), and obesity. Tr. 90.

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 91.

---

[2] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

5.      The claimant has the residual functional capacity to perform light work
        activities defined in 20 CFR 404.1567(b) and 416.967(b) except she can
        lift and carry twenty pounds occasionally and ten pounds frequently;
        stand or walk for six out of eight hours; and sit for six out of eight hours.
        The claimant can frequently push and pull.  She can frequently climb
        stairs, balance, stoop, kneel, crouch, and crawl, but can only occasionally
        climb ladders.  Tr. 91-92.

6.      The claimant is capable of performing past relevant work as a retail
        manager, retail assistant manager, food service manager, shirt presser,
        and salad maker.  This work does not require the performance of work-
        related activities precluded by the claimant's residual functional capacity.
        Tr. 95.

7.      The claimant has not been under a disability, as defined in the Social
        Security Act, from June 6, 2013, through the date of this decision.  Tr. 96.

## V. Parties' Arguments

Beadle objects to the ALJ's decision on two grounds.  She argues that the ALJ did not

follow the treating physician rule with respect to Dr. Morse's opinion and that the ALJ

improperly counted Beadle's non-compliance with treatment against her, especially when

Beadle's non-compliance was due to her inability to afford her medications.  Doc. 12, pp. 4-7.  In

response, the Commissioner submits that the ALJ did not err with respect to her consideration of

Dr. Morse's opinion and that she properly considered Beadle's non-compliance with treatment.

Doc. 14, pp. 6-12.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A.  The ALJ did not violate the treating physician rule

Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2).  If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *Wilson*, 378 F.3d at 544.  In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole.  *See* 20 C.F.R. § 416.927(c); *Bowen v. Comm'r of Soc. Sec*., 478 F.3d 742, 747 (6th Cir. 2007).

With respect to Dr. Morse's opinion, the ALJ explained,

As for the opinion evidence, the claimant's primary care physician Willis Morse, M.D. submitted reports opining as to the claimant's functional abilities on June 6, 2013 and September 19, 2013.  (Exhibits 4F and 9F at pp. 26-28).  In June, Dr. Morse noted that the claimant's vision was affected by diabetes.  (Exhibit 4F)  He opined that the claimant could not drive until she had better diabetic control.  In September, Dr. Morse filled out a form for Ohio Job and Family Services.  (Exhibit 9F at pp. 26-28)  He opined that the claimant could lift and carry five pounds, stand and walk for three out of eight hours, and sit for three out of eight hours.  Dr. Morse further maintained that the claimant had

marked limitations in pushing and pulling, bending, reaching, handling, and repetitive foot movements. These opinions are granted little weight pursuant to 20 CFR 404.1527 and 20 CFR 416.927. I note that Dr. Morse has not seen the claimant in over a year. Although he is a treating source, Dr. Morse's first opinion failed to provide the duration for the claimant to be subject to a driving restriction. The medical evidence also demonstrates that the claimant does not suffer from diabetic retinopathy. (Exhibit 6F). As for his second opinion, Dr. Morse's significant lift, carrying, standing, walking, and sitting limitations are wholly unsupported by the treatment notes. The claimant alleged some weakness, fatigue, and neuropathy but had largely negative examination findings. The claimant also engages in a rather significant range of daily activities requiring physical exertion. These activities include working twenty hours a week, cleaning, dusting, vacuuming, doing laundry, washing dishes, cooking, and grocery shopping.

Tr. 94.

Beadle argues that the ALJ failed to give proper weight to Dr. Morse's opinion.[3] Doc. 12, p. 4. She asserts that the ALJ's statement—that Dr. Morse's opinion is "wholly unsupported by the treatment notes"—is incorrect. Id. She argues, without any citations or references to any of Dr. Morse's treatment notes, that Dr. Morse's notes "provide nothing which is inconsistent with his opinion." Id. This argument fails. As described above in the Medical Evidence section of this opinion, Dr. Morse routinely found Beadle to be asymptomatic for hypertension and to have a normal gait, normal motor strength, normal reflexes, and normal sensation in her extremities. These objective findings are inconsistent with Dr. Morse's opinion that Beadle could carry no more than five pounds, stand or walk and sit for no more than three hours, and had marked postural limitations as well as marked limitations in her ability to push and pull.

Next, Beadle asserts that her endocrinologist, Dr. Brown, found Beadle to have diminished sensation in her right foot. Doc. 12, pp. 4-5 (citing Tr. 393, 395 (Dr. Brown treatment note from 11/5/2014)). She states, "This provides support for Dr. Morris' [sic] finding regarding the Plaintiff's ability to stand." Id. First, a diminished sensation in a right foot does

---

[3] Throughout her brief, Beadle refers to a Dr. "Morris." Doc. 12, p. 4. The Court assumes that she is referring to Dr. "Morse," her treating physician. Moreover, at the hearing, the ALJ asked Beadle's attorney, "are you relying on a particular medical source statements?" and Beadle's attorney answered, "No, your honor." Tr. 13.

not automatically equate to an inability to stand for more than one hour at a time or for more than

three hours total in an eight-hour workday. Second, Dr. Morse did not observe Beadle to have

diminished sensation in her right foot. Thus, any diminished sensation that Dr. Brown observed

does not provide support for Dr. Morse's opinion. That is especially true when, as here, Dr.

Brown observed diminished sensation in Beadle's right foot more than a year after Dr. Morse

rendered his opinion and in at least one visit, Dr. Brown found Beadle to *not* have diminished

sensation in her right foot (Tr. 402). Finally, that Dr. Brown's finding allegedly calls into

question Beadle's ability to stand does not address the rest of Dr. Morse's opinion finding Beadle

significantly limited in a myriad of other ways. In short, the ALJ's finding that Dr. Morse's

opinion was entitled to little weight because it was unsupported by the record, including Dr.

Morse's own treatment notes, did not violate the treating physician rule and is supported by the

record. *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) ("[T]he ALJ 'is not bound by

conclusory statements of doctors, particularly where they are unsupported by detailed objective

criteria and documentation.'") (quoting *Cohen v. Secretary of Health & Human Servs.*, 964 F.2d

524, 528 (6th Cir. 1992)).

**B. The ALJ properly considered Beadle's non-compliance with treatment**

Beadle asserts, "The Social Security program is not fault-based." Doc. 12, p. 5. She

argues, "the ALJ makes several findings which suggest that fault has improperly influenced her

Decision. An example is the ALJ's finding that Plaintiff's 'symptoms are exacerbated due to

poor compliance with medications and prescribed treatment. All of these factors negatively

affect the credibility of the claimant's allegations.'" Id.

An ALJ properly considers a claimant's non-compliance with treatment when assessing

the claimant's limitations and credibility. *See* 20 C.F.R. § 416.930(b) ("if you do not follow the

prescribed treatment without a good reason, we will not find you disabled"); 20 C.F.R. § 416.929(c)(3)(iv, v)(in considering the severity and limiting effects of an impairment, an ALJ may consider the effectiveness of medication the claimant has taken and treatment she received). The ALJ discussed Beadle's non-compliance with Dr. Morse's order that she not drive (Tr. 92), observed that she did not check her blood sugar level as often as recommended (Tr. 93), and noted that she continued to smoke cigarettes regularly despite her COPD (Tr. 94).

The ALJ also commented that the record showed that Beadle required hospitalization three times, in May, June and September 2013, when she did not take her diabetes medication. Tr. 93. An inability to afford treatment may result in a finding that a claimant is disabled. *See McKnight v. Sullivan*, 927 F.2d 241, 242 (6th Cir. 1990) (discussing a Fifth Circuit opinion involving a claimant who cannot afford prescribed medicine and can find "no way to obtain it."). Here, the ALJ did consider Beadle's stated inability to afford her medications as prompting those hospital visits. Tr. 93. Beadle does not allege, nor can she show, that she can find "no way to obtain" her medications. *See McKnight*, 927 F.2d at 242. Indeed, the record shows that she was hospitalized once when she stopped taking her glipizide in June 2013 and the hospital informed her that she could get glipizide for $4. Tr. 276-277. Upon her next hospitalization, in September, she informed staff that she had run out of glipizide and had not been taking it. Tr. 342. During that time, she continued to smoke cigarettes. At the hearing, when asked why she let herself run out of medication, she stated, "I did not have insurance and I wasn't working, so I didn't have the money, so I couldn't afford it. If it wasn't for the insurance, I probably wouldn't have it now." Tr. 29. The ALJ asked Beadle how much she was smoking during that time and Beadle stated that, in the summer of 2013, she smoked a pack of cigarettes a day. Tr. 29-30. In other words, Beadle does not allege, and the record does not support, a finding that she can find

no way to obtain her medication.  *See Sias v. Sec'y of Health & Human Servs.*, 861 F.2d 475, 480 (6th Cir. 1988) (stating "[the claimant] claims he has not worn the support hose his physician prescribed to alleviate swelling because support hose would cost too much—yet the claimant admits that against the advice of his doctor he smokes two packs of cigarettes a day[,]" the court found that substantial evidence supported the ALJ's decision and observed that the claimant could have afforded the support hose if he gave up cigarettes).  Moreover, Beadle is able to work, as the ALJ commented ("She works part-time as a cashier and only does not work full-time because she cannot get any more hours"), and engages in normal daily activities, including cleaning, dusting, vacuuming, doing laundry, washing dishes, cooking, grocery shopping, driving, making crafts with her grandchildren, and searching for jobs on the internet. Tr. 92.  And she now has insurance, which covers her medication.  Tr. 29.  She does not contest the ALJ's finding (and the medical evidence) that her symptoms were exacerbated due to her poor compliance with medications and prescribed treatment, that her condition was controlled when she took her medication, and that she has since been taking her medication.[4]

Beadle's argument that the ALJ improperly considered her non-compliance with treatment is without merit.

---

[4]  Although Beadle asserts that disability determinations are "no fault," "the Social Security Act did not repeal the principle of individual responsibility."  *Ross v. Comm'r of Soc. Sec.*, 2013 WL 1284031, at *12 (N.D.Ohio March 26, 2013)(citing *Sias*, 861 F.2d at 480).

## VII. Conclusion

For the reasons stated above, the undersigned recommends that the decision of the

Commissioner be **AFFIRMED**.



Dated: November 3, 2016

_(signature)_
_____
Kathleen B. Burke
United States Magistrate Judge




## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within fourteen (14) days after the party objecting has been served with a copy of this
Report and Recommendation.  Failure to file objections within the specified time may waive the
right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir.
1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986)